```
1                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF CALIFORNIA
2               BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

3                             ---o0o---

4

    WINNEMUCCA SHOSHONI, MBS, ET AL.,
5
          Plaintiffs,
6
    Vs.                                CASE NO. 2:17-CV-2271 KJM
7
    SAN JOAQUIN COUNTY BOARD
8   OF SUPERVISORS, ET AL.,

9         Defendants.
    _____/
10

11                            ---o0o---

12             REPORTER'S TRANSCRIPT OF PROCEEDINGS
                RE:  PLAINTIFFS' MOTION FOR TRO
13           THURSDAY, NOVEMBER 30TH, 2017 - 3:30 P.M.

14                            ---o0o---

15  APPEARANCES:

16  For the Plaintiffs:   LAW OFFICES OF JOSEPH SALAMA
                          165 N. Redwood Drive Suite 285
17                        San Rafael, California  94903
                          BY:  JOSEPH SALAMA, ATTORNEY AT LAW
18

19  For the Defendants:   COTA COLE & HUBER LLP
                          2261 Lava Ridge Court
20                        Roseville, California  95661
                          BY:  DEREK P. COLE, ATTORNEY AT LAW
21                        BY:  RONALD J. SCHOLAR, ATTORNEY AT LAW

22

23  Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR
                  Official Court Reporter USDC, 916-446-6360
24                501 I Street, Room 4-200
                  Sacramento, California  95814
25  TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

1    SACRAMENTO, CALIFORNIA, THURSDAY, NOVEMBER 30, 2017, 3:30 P.M.

2                               ---o0o---

3         THE CLERK:  Calling Civil Case 17-2271, Winnemucca

4    Shoshoni, MBS, et al., versus San Joaquin County Board of

5    Supervisors, et.  This is on for plaintiff's motion for a

6    temporary restraining order.

7         MR. SALAMA:  Joseph Salama appearing for the moving

8    party, Your Honor.

9         THE COURT:  All right.  Good afternoon, Mr. Salama.

10        MR. COLE:  Your Honor, good afternoon.  Derrick Cole

11   and Ron Scholar on behalf of the defendants.

12        THE COURT:  All right.  Good afternoon to you each.

13     And you're joined at counsel table by...?

14        MS. VIRK:  Kirin Virk of the San Joaquin County

15   Counsel's Office on behalf of the defendants.

16        THE COURT:  If you could make certain you have the

17   microphone directly in front of you when you are speaking, that

18   would assist us.

19     I have just a few questions.  Then if you think there is

20   something not fully covered by the briefing, you can let me

21   know.  But I have reviewed all of the briefing and the

22   documents filed in support or opposition of the motion for

23   temporary retaining order.

24     I don't know if it ultimately matters to my decision here

25   today, but I want to make certain that I understand the

1   context.

2        Is it essentially the case that the state law does allow

3   for a qualified agriculture or academic research entity to

4   engage in research starting as of January 1st of this year?

5                MR. SCHOLAR:  That's correct.  Under the California

6   Food and Agriculture Code, that is correct, that the CDFA

7   controls that.

8                THE COURT:  That's statutory, without any regulatory

9   framework being put in place?

10               MR. SCHOLAR:  That is correct.  That's how it reads

11  right now.

12               THE COURT:  And no one -- there's a reference in the

13  ordinance to the need for clarification by regulation, but are

14  regulations contemplated to clarify that provision of the state

15  law?

16               MR. SALAMA:  Yes, Your Honor, they are.

17               THE COURT:  I'm asking Mr. Scholar first.

18               MR. SCHOLAR:  I'm not aware if there are or there

19  aren't.  I know there are regulations on the commercial side.

20               THE COURT:  But those aren't due for at least another

21  year?

22               MR. SCHOLAR:  That's correct.

23               THE COURT:  So the regulations are being --

24               MR. SALAMA:  That's my understanding, Your Honor.

25               THE COURT:  -- for the research function?

1          MR. SALAMA:  That's my understanding, Your Honor, yes.

2          THE COURT:  But in any event, localities are forging

3     ahead in both areas, research and commercial, and some

4     localities are allowing and providing for commercial starting

5     January 1st, 2018.

6        Help me understand San Joaquin County's designation as a

7     "pilot project county for research."  I didn't see that you

8     disputed that designation.

9          MR. SCHOLAR:  I couldn't find the citation to it, so

10    I'm not sure where Mr. Salama got that from.

11         THE COURT:  Do you dispute that it has been so

12    designated?

13         MR. SCHOLAR:  I can't say.

14         THE COURT:  All right.

15       What is the basis for that representation, Mr. Salama?

16         MR. SALAMA:  I can pull it up, Your Honor.  As we're

17    going, I can pull up the citation.

18         THE COURT:  Is it statutory?

19         MR. SALAMA:  I believe I read it in the comments of

20    the statute.

21         THE COURT:  Well, you can -- I'll give you a chance to

22    provide that in a supplemental letter if I determine I need it.

23       Is there any separate litigation challenging the vagueness

24    of any definition that anyone here knows of?

25         MR. SCHOLAR:  Not that we're aware of, but we've only

1  had this for a few days.

2        THE COURT:  All right.

3     Mr. Salama, are you aware of any separate litigation that

4  might be addressing questions raised by the parties' briefing

5  here?

6        MR. SALAMA:  Nothing that is filed, Your Honor, no.

7        THE COURT:  All right.  So here are my questions for

8  Mr. Salama.

9        MR. SALAMA:  Yes, Your Honor.

10        THE COURT:  Just trying to clarify.

11     It appears to me that plaintiffs are saying -- that they're

12  characterizing their activity in multiple ways.

13        MR. SALAMA:  That is correct.

14        THE COURT:  So is that what it is?  It is three

15  pronged?

16     So would you concede it is commercial in part?

17     It is commercial, that there is reference to a business

18  activity.  There is some suggestion maybe it is not for profit,

19  but it is still some kind of business operation.  But then

20  there is also reference to research.

21     So is it, in fact, all three?

22        MR. SALAMA:  If I may, Your Honor, it's commercial

23  inasmuch as you can describe -- I mean, Chief Bills, who is

24  here, is trying to get everybody who needs this enough

25  medicine.  So that's his purpose.  And if that's a commercial

1   purpose, he's -- he is selling product.

2          THE COURT:  But that's not a research purpose.

3          MR. SALAMA:  No, that is not.  His part of it is not.

4   You're right.  At least not yet.

5      I mean, there's a wealth of great subjects now who can be

6   used for research, but nothing is contemplated yet.

7          THE COURT:  But isn't that the only basis on which the

8   plaintiffs could be proceeding at this point, would be as a

9   qualified, established agriculture research institution?

10          MR. SALAMA:  That's my understanding, yeah.

11          THE COURT:  So what in the record allows me to

12   identify any plaintiff qualified as that, assuming that I'm

13   prepared to apply the state's statutory definition and I don't

14   find it vague?

15          MR. SALAMA:  Uh-huh.  We have agents of the

16   plaintiffs, who aren't named, S.G. Farms, the principals of

17   which are present here today, who can describe the research

18   that they're doing.

19      And we have members of Cannabis Science Inc. that published

20   the article that I attached to, I believe, the moving papers

21   and the reply, just the one about nanoparticles published in

22   the Journal of Oncology that shows both scientific and

23   agricultural research.

24          THE COURT:  How does that allow me to conclude that

25   any plaintiff qualifies as an established agricultural research

1    institution?

2           MR. SALAMA:  I don't think that that's a great

3    conclusion, Your Honor.  I would be worried about that too,

4    Your Honor.

5        I think that those that have published and that are

6    recognized, that have been doing this since before this law

7    came along, that have been doing agricultural research for five

8    or six years before this ever became an issue, I think those

9    ones should be recognized, ones that are published in

10   conjunction with, you know, people from Harvard and University

11   of Mass Lowell.  That's legitimate research.  You can verify

12   it.  It is citable.  It is a genuine journal.

13          THE COURT:  But the record -- you have had the

14   opportunity, I mean, to create a record to allow me to make

15   that conclusion.  You haven't requested an evidentiary hearing.

16       Looking at the definition the state provides, how does

17   anything before me allow me to conclude that there is a public

18   or private institution or organization that maintains land or

19   facilities for agricultural research?

20          MR. SALAMA:  We provided in the declaration of

21   Mr. Bianchini plenty of evidence that he was doing research.

22   He described, you know, the different heights of the plants and

23   his purpose there.  He described his water conservation system

24   and the wicking system that he used to minimize the water

25   usage.  Despite that, the plants were amazingly beautiful.  So

1   it was something that was working apparently too.

2          THE COURT:  But there has to be maintenance of land or

3   facilities for research.

4          MR. SALAMA:  The land had to be pristine in order for

5   this grow to happen, at all.  The land -- the soil had to be

6   free of any contaminants.

7      I mean, not all of the county's concerns, although some

8   were very suspect, but not all of them were completely

9   irrelevant.  And it is not easy to grow something like that.

10  And in order for them to have grown it, the soil needed to be

11  perfect.  And they made sure it was.  I mean, that was part of

12  the purpose.

13         THE COURT:  So help me understand the thrust of the

14  request for a TRO.  What exactly are plaintiffs seeking to

15  protect or allow for in the future?

16         MR. SALAMA:  Notwithstanding recovery of whatever is

17  available that remains, they wish to protect their right to do

18  that again on the property because --

19         THE COURT:  So it is growing?

20      So they want to start growing immediately again?

21         MR. SALAMA:  I believe so, Your Honor.  They want to

22  get it ready for it.  They want to invest the time in getting

23  the soil back to where it needs to be.

24      And you know, the amount of time and energy -- I know this

25  isn't where Your Honor's looking to go, but the amount of time

1   and energy that was wasted, they don't want to undertake that

2   again if they have a fear that this could happen again.

3          THE COURT:  So again, what in the record before me

4   allows me to know the need to do that immediately, to begin

5   work on the ground immediately if I decide that the test for a

6   TRO is satisfied?

7          MR. SALAMA:  The irreparable harm that will result to

8   many of the people who are taking the medicine, the CBD.  The

9   lost opportunity in -- you know, there is a definite four-year

10  period remaining that people have in which to conduct this

11  research.

12     And like from Mr. Bianchini's point of view, he has to

13  start all of those projects over again.

14         THE COURT:  Where does the four-year period come from?

15         MR. SALAMA:  I believe it is statutory.  I believe

16  it's from same statute I'm looking up for Your Honor --

17         THE COURT:  That the pilot projects are allowed?

18         MR. SALAMA:  Yes, Your Honor.

19         THE COURT:  Anything to say based on what you have

20  heard so far, Mr. Cole or Mr. Scholar?

21         MR. SCHOLAR:  A couple of points.  I think Your Honor

22  hit the nail on the head.  This is a commercial enterprise.

23  They're selling to, by their own admission, over 8,000

24  different individuals.  Regardless of whether it is medicine or

25  not is not the issue.  The issue is that is a commercial

1    enterprise.

2         And they haven't presented any evidence of studies that

3    they're doing through this American States University.  And the

4    fact is that American States University, while it may have

5    standing under 17(b) under that exception, it is not an

6    institution of higher education under the law because as a

7    suspended corporation in California it cannot act.

8              THE COURT:  I understand that position.

9              MR. SCHOLAR:  That also applies to Subdivision (1),

10   about being a public or private institution.  They can't act.

11             THE COURT:  If it came current on its taxes, if that's

12   what's involved here, would it then be able to act?

13             MR. SCHOLAR:  It would be able to -- if it was no

14   longer suspended by the Franchise Tax Board and if it were

15   proven to be an agricultural institute, then it might.  But

16   that's all, you know, in the ether here.  We're here on, you

17   know, a TRO, and we haven't done any discovery on them.

18        And I would also point out that Mr. Bianchini submitted a

19   declaration.  He's the proprietor of S.G. Farms.  He's not a

20   plaintiff, and neither are the 8,000 other people that

21   apparently they're providing the CBD oil to.

22             THE COURT:  I did have a question about that.  We'll

23   get to that in just a moment.

24        Let me just -- so anything else?

25             MR. SCHOLAR:  Just the last thing is, you know, they

1    talk about this lost opportunity to do research and that they

2    need to start -- apparently start growing now.  Although,

3    Mr. Salama said that he think that's the case, but there's no

4    evidence in the record that says that we have to plant by X

5    date or we're going to miss this window to do, you know,

6    whatever it is they want to do for scientific purposes.  Let's

7    assume that is what is going on.  They haven't provided any

8    evidence of that, and that's their burden.

9        And the last point I would want to make is, you know, they

10   say they're doing research.  This was 26.9 acres' worth of

11   plants.  That's a lot of plants.

12       Their grow in Nevada, which they provided the certificate

13   for, was four acres.  So there is a big difference, I think,

14   there.  And I think that the size of the grow folds into the

15   fact that this is really a commercial operation.

16           THE COURT:  All right.  Let me ask a few questions

17   about the harms that are claimed because that's -- plaintiff

18   does have the burden -- plaintiffs have the burden to show,

19   among other things, that they're likely to suffer irreparable

20   harm in the absence of preliminary relief.

21       And so the harms I believe plaintiffs are bringing to my

22   attention are follows:  First, constitutional harm.

23           MR. SALAMA:  Yes.

24           THE COURT:  Harm to the constitutional rights of the

25   plaintiffs.  And unquestionably, that could support a TRO if

1   those rights are actually implicated.

2      Here there is a seizure alleged, but I think plaintiffs

3   concede that that's -- that can be addressed through economic

4   damages.

5      Agreed?

6           MR. SALAMA:  The actual physical removal?

7           THE COURT:  You have identified a number.  The plants

8   are gone.  They've been destroyed except for samples.  So

9   that's the only thing that could address any seizure is

10   monetary -- is monetary damages, correct?

11           MR. SALAMA:  Inasmuch as we're talking about what was

12   seized, yes, Your Honor.

13      If we're talking about the fact that there is no medicine

14   for any of the people who were taking it now, as a result, that

15   flows directly from the seizure as well.

16           THE COURT:  But that -- none of those people are

17   plaintiffs.

18           MR. SALAMA:  They are, Your Honor.  Chief Bills is one

19   of them, and he represents the tribe.  And many of the members

20   of the tribe, a couple of whom submitted declarations, are

21   affected.

22           THE COURT:  Are you saying --

23           MR. SALAMA:  He's representing several of the

24   Winnemucca families, two or three of whom submitted

25   declarations.

```
 1            THE COURT:  I read those declarations.  But he's
 2   not -- you're not saying it is a collective action on behalf of
 3   8,000-some members?
 4            MR. SALAMA:  No, Your Honor.  They don't have that
 5   many members.
 6            THE COURT:  At most it is Chief Bills, himself, plus
 7   the few people who submitted declarations?
 8            MR. SALAMA:  And it is his tribe.  It is about 70
 9   families, Your Honor.
10            THE COURT:  And Chief Bills is not an individual
11   plaintiff?
12            MR. SALAMA:  No, he's not, but he is the
13   representative of that tribe.
14            THE COURT:  That's disputed.
15      What's your response to the declaration challenging the
16   status of the tribe?
17            MR. SALAMA:  First, I want to apologize to you, Your
18   Honor.  The minute order that was issued -- or the order on the
19   docket said that the reply was due by Monday, November 29th, at
20   9:00 a.m., and I filed it on November 29th at 9:00 a.m. but it
21   was not a Monday.  And I want to make sure Your Honor has seen
22   the reply, because we did address that at length.
23            THE COURT:  I saw the reply.
24            MR. SALAMA:  Okay.  It was two pages.  So we had one
25   or two sentences about that issue, Your Honor.  It wasn't very
```

1   lengthy.  I apologize for the lack of style in that piece of

2   writing.

3          THE COURT:  And there is a supplemental declaration

4   there.

5          MR. SALAMA:  Yes.  And we have further documentation,

6   Your Honor.  And part of it is that it's a self-governed group.

7   The tribe's ability to call itself a tribe is the tribe's

8   right.

9          THE COURT:  Well, so let's first -- again, to the

10  extent that I need to understand this a little bit, what's the

11  defense response to the supplemental Bills declaration?

12         MR. COLE:  Your Honor, we have done some additional

13  research, and I apologize to the court that I don't have the

14  citation, but I think it is unfortunate that the plaintiffs did

15  not bring to this court's attention the District of Nevada

16  District Court litigation involving the Shoshoni Tribe in which

17  Mr. Bills has been granted intervenor status.

18     In that case the district judge has entered an order that

19  recognizes five members as the tribal council authorized to

20  speak on behalf of the Shoshoni Tribe, and Mr. Bills is not a

21  member of that.

22     I apologize to this court that I don't have the citation,

23  but that is a pending case in the District of Nevada.  And in

24  that case your colleague on the Nevada District Court bench has

25  recognized the governing council on behalf of the Shoshoni

1    Tribe, and Mr. Bills has specifically been excluded from that.

2       I don't know why the plaintiffs did not choose to bring

3    this to this court's attention.  I apologize that we did not

4    discover that in time to bring it to this court's attention in

5    our opposition, but that is the record.  It is something that

6    could be accessed via PACER.  But Mr. Bills has no

7    authorization whatsoever to speak on behalf of an entire tribe.

8          THE COURT:  So first on that issue, do you dispute the

9    characterization of the Nevada order?

10         MR. SALAMA:  I don't know enough about it to dispute

11   it or not dispute it, so I have no reason to doubt it, Your

12   Honor.  But I do dispute that that's Mr. Bills' tribe.  If he

13   isn't part of the tribe that was designated, he's part of a

14   different tribe.

15         THE COURT:  Let's assume for sake of argument here,

16   just to give the plaintiff -- even though it is plaintiffs

17   burden --

18         MR. SALAMA:  Yes.

19         THE COURT:  -- ultimately, and it is a high burden at

20   this stage, assume there is Chief Bills and a few people who

21   provided declarations.  How is anecdotal evidence based on what

22   must be only a few months, a very short period of time of use,

23   how is that sufficient to meet the high burden of showing that

24   there would be irreparable harm to the health of those

25   individuals such that an injunction should issue that would

1    allow ground to be prepared for replanting?

2            MR. SALAMA:  I don't think any of that was disputed by

3    the opposition, Your Honor.  Witnesses are available -- I'm

4    sorry, Your Honor.

5            THE COURT:  Just tell me what your -- what's the

6    argument in response to that question?

7            MR. SALAMA:  The argument is that they are actually,

8    genuinely harmed, Your Honor.  If Your Honor wishes, we could

9    have an evidentiary hearing about that.  We could bring in a

10   long line of people who will say that they are part of Chief

11   Bills' tribe, that they're Native American, that their land

12   allotment goes back and is recorded.

13           THE COURT:  I'm focusing on the health question now.

14           MR. SALAMA:  And that they have benefited tremendously

15   by the CBD.

16           THE COURT:  But is there more than anecdotal evidence?

17           MR. SALAMA:  Is Your Honor contemplating -- I' not

18   sure what Your Honor is contemplating.

19           THE COURT:  Is there anything that goes beyond what's

20   in the declarations that I have?

21           MR. SALAMA:  There are plenty of other people who have

22   similar -- well, with other diseases, they have stories that

23   they can tell you about how they witnessed one another going

24   through this change.

25           THE COURT:  But those are all third parties.

1          MR. SALAMA:  They're part of Chief Bills' tribe, Your

2    Honor.

3          THE COURT:  So then in terms of the market placement,

4    that's -- there are two other types of harm?

5          MR. SALAMA:  Yes.

6          THE COURT:  And this is consistent with the business

7    characterization --

8          MR. SALAMA:  Yes.

9          THE COURT:  -- of the plaintiffs, that they will lose

10   a place in a market that is opening up?

11         MR. SALAMA:  Yes.

12         THE COURT:  But that's, again, a commercial loss that

13   could be compensated ultimately through money damages.

14      Agreed?

15         MR. SALAMA:  I think in an ordinary case it would be,

16   Your Honor, for certain, but when it comes to the relationship

17   between the United States and the Native Americans, we're

18   talking about shooting them in the foot the day they came out

19   on their big race.

20      It is something that -- it goes beyond mere money.  It is a

21   symbolic situation.  It is a tragedy.  It really is.

22         THE COURT:  I understand that backdrop, but there is

23   no -- there are no sovereignty issues raised here with respect

24   to the land.

25         MR. SALAMA:  No, there aren't, Your Honor.

1          THE COURT:  So finally, the other harm that I've

2     identified, based on reading the briefings, is a setback to

3     medical research based on use of industrial hemp products.  But

4     I'm not seeing meaningful detail about what that research looks

5     like, the timing, why it is essential to allow that research to

6     proceed or at least preparation of land for planting of the

7     products now.

8          MR. SALAMA:  There was that part of it, as well as the

9     agricultural research part of the research.  So there's the

10    scientific part and the agricultural part, which we believe we

11    fleshed out considerably in Mr. Bianchini's declaration.

12       And again, if Your Honor wishes, he's available to testify

13    today or with notice.

14         THE COURT:  But there is not a protocol.  There is not

15    a research plan.  Do you think I have that?

16         MR. SALAMA:  No.  No, Your Honor.  I think that's part

17    of what they are doing.  That's what they're developing.

18    That's what makes it a very difficult area because it is hard

19    to lay out a criteria for something when we haven't even looked

20    at this product in over 70 years, you know.

21       And part of what the pilot program is designed to do is to

22    establish these rules and establish this framework in which it

23    makes sense to do the research.

24         THE COURT:  But if there is an imminent need to

25    proceed with that, there would be a detailed plan, research

1    protocol that tells the court exactly what needs to happen

2    starting tomorrow.

3              MR. SALAMA:  If Your Honor wishes, we can provide

4    that.

5              THE COURT:  It is not what I wish.  It is what

6    plaintiffs need to meet the high burden at this stage of the

7    case.

8         Again, Mr. Cole, Mr. Scholar, anything that you would say

9    in response to what you have heard from plaintiffs' attorney?

10             MR. SCHOLAR:  Well, one thing I would like to point

11   out, this is in Mr. Bills' declaration at paragraph 4, on page

12   3, where he says, quote:

13        (Reading:)

14        Fortunately, we have other grows aside from the one which

15        is the subject of this case.

16        (Reading concluded.)

17        Okay.  Then he talks about short supply.  But that's

18   conclusionary.  There is no fact there.  And then he says:

19        (Reading:)

20        Although, we sell CBD to maintain and grow our business.

21        (Reading concluded.)

22        So that's what we're talking about here.  We're talking

23   about a commercial enterprise that has other sources, besides

24   this particular source.

25        I mean, they were only able to start growing -- I think

1    they started this grow sometime in April or May.  So how could

2    8,000 people be relying on it, even if you wanted to go there.

3         The next thing I would point out to the court is, if you

4    look at how the case is pled at page 2 of the complaint,

5    paragraph 3, it identifies Plaintiff Winnemucca Shoshoni, MBS.

6    I'm not sure what that stands for.  It says that they are a

7    sovereign Native American tribe.

8         Okay.  The sovereign Native American tribe is the

9    Winnemucca Indian Colony.  That's why we got the declaration

10   from Miss Rojo, the chairperson.  That's the tribe.  Not this

11   Winnemucca Shoshoni MBS, whatever that may be.

12        So I don't know what that entity is yet.  We'll find out.

13   But to say that they have --

14             THE COURT:  One at a time.

15             MR. SCHOLAR:  -- that that gives them a basis to claim

16   harm over a large group of people, doesn't -- there is no

17   connection there, at least it is not in the papers.  Maybe it

18   is in that folder that Mr. Salama just had, but it wasn't

19   served on us.

20        Then the last thing is when you talked about the medical

21   research, you're right, that's how science works.  You have a

22   hypothesis and then you test the hypothesis based on a protocol

23   and a research plan.  And you do all of that before you tend to

24   the soil because you have to record that.  And do you all of

25   that before you put the plants in the ground.  Not after.

1    That's not how research is done.

2            THE COURT:  All right.  Anything further, Mr. Salama?

3            MR. SALAMA:  Yes.  Merely because we offered to

4    provide records afterwards doesn't mean that those weren't in

5    existence beforehand.

6        I presume that Mr. Bianchini has his whole plan laid out,

7    and we could provide that.

8        I'm looking right now, Your Honor, this seems to be a -- we

9    didn't think would be in dispute.  We have letters from the

10   United States government recognizing Chief Bills and members of

11   his tribe repeatedly, in many different documents, and they

12   could be provided to the court or opposing counsel if that

13   remains an issue.  I didn't know it was going to be, Your

14   Honor.

15           THE COURT:  Well, they did provide the declaration of

16   Miss Rojo.

17           MR. SALAMA:  They did, Your Honor.  And there are at

18   least -- my understanding is there are at least three different

19   Winnemucca tribes.

20           THE COURT:  And their representation is that it is the

21   Winnemucca Indian Colony.

22           MR. SALAMA:  This -- the one distinction that I can

23   say, in perfect honesty I fully see, that is unique from all

24   the other ones, is their names are on the land.  They are

25   titled owners, and they go all the way back.  That's what the

1     supplemental records and the supplemental declarations show.

2         It is not very valuable land, as Your Honor probably noted,

3     as well, but it is their names on it.  It is -- they are the

4     land owners, the original Native American land owners, the

5     allotment families.  And I don't think any of the other

6     Winnemucca families can say that, any of the other colonies or

7     tribes can say that.

8              THE COURT:  I don't think I can get to bottom of that

9     today.

10        Is there anything else you wanted to say on any other

11    aspect of the motion at this time?

12             MR. SALAMA:  Just that if Your Honor requires further

13    evidence, we're available for an evidentiary hearing now or in

14    the future.

15             THE COURT:  I don't think the record supports that at

16    this point given the very vague proffers and the record that

17    the court has at this time.

18        And I'm persuaded that I don't need time to think about

19    this.  I am persuaded there is not a basis for a TRO today.  So

20    I'm denying the motion for TRO, and I want to clarify the basic

21    standards that I'm applying.

22        I think, as counsel knows, a TRO is an extraordinary remedy

23    and issues only upon a showing that immediate and irreparable

24    injury, loss or damage will result to the movement.

25        And the standards are essentially the same as the

1    preliminary injunction standards.  Plaintiffs can still move

2    for a preliminary injunction in the future.

3         In determining whether or not to issue a TRO today, the

4    court considers basically four factors:

5         Whether or not plaintiffs are likely to succeed on the

6    merits; whether or not they're likely to suffer irreparable

7    harm in the absence of preliminary relief; whether or not the

8    balance of equities tips in plaintiffs' favor; and whether or

9    not an injunction is in the public interest.

10        That's with reference to Ninth Circuit authority.

11        And plaintiffs do have the very heavy burden of proving

12   each of those factors.

13        Here the court does not need to go beyond the second

14   factor, the irreparable harm factor.  That's why I focused on

15   what I identified as the areas of harm.

16        And it is just clear to the court, at least at this time on

17   the record before the court, that the plaintiffs cannot satisfy

18   that single most important requirement of obtaining a temporary

19   restraining order.

20        Speculative future harm is not enough.  Plaintiffs need to

21   provide proof that future harm is likely.  And that's with

22   reference to the Ninth Circuit case of Herb Reed v. Florida

23   Entertainment Management, 736 F.3d 1239 at page 1251.  That's a

24   Ninth Circuit case of 2013.

25        I've reviewed each of the aspects of harm, and I don't

1    think any harm is shown here as likely that cannot be addressed

2    through monetary damages.  The constitutional harms, the

3    seizure can be addressed through monetary damages.

4       The possibility of recurrent harm is, at this point, purely

5    speculative.  Therefore, plaintiffs need very compelling,

6    particularized evidence for me to find that any harm to

7    constitutional values, which are sacred, would justify

8    temporary or preliminary relief.

9            MR. SALAMA:  Can I ask you --

10           THE COURT:  I'm telling you what my order is.

11      In terms of the health of members of Winnemucca Shoshoni,

12   MBS, there is a question about the tribal status.  That can be

13   clarified, perhaps, on a preliminary injunction motion.

14      To the extent there is a harm to third parties here, that

15   simply cannot support.  And I can't conclude at this point that

16   the harm is not to third parties, even if there is a legitimate

17   health interest.

18      Market placement, to the extent there is harm to market

19   placement, that is an economic issue that can be addressed

20   through monetary damages.

21      And to the extent there is a concern about setback to any

22   research into the value of medical uses related to industrial

23   hemp or agricultural research, I understand that clarification,

24   the court simply does not have the details that show that that

25   research is anything more than something that is speculated.

1    The court would need to see a protocol, detailed plans,

2    schedules and a legitimate research proposal for it to find

3    that there is harm by not being able to proceed with the

4    research.

5        So I find I don't need to reach the merits.  There are

6    interesting questions related to the ordinance, but I don't

7    need to get there.  That would be essentially an advisory

8    opinion, I believe, because plaintiffs need to get past that

9    irreparable harm hurdle.

10       So I'm denying the TRO.  I'm doing it in this bench order.

11   It does not preclude the plaintiffs from filing for a motion

12   for preliminary injunction, a noticed motion with further

13   briefing.

14       I don't know if plaintiffs are contemplating an amendment

15   to the complaint, but you have a sense of the court's questions

16   and concerns.

17            MR. SALAMA:  Absolutely, Your Honor.

18            THE COURT:  And if there is a motion for preliminary

19   injunction calendared, then the court will hear that.

20            MR. SALAMA:  Those concerns would be addressed?

21            THE COURT:  Absolutely.  I'm telling you what I think

22   stands in the way.  It doesn't preclude, but it would need to

23   be a much focused and developed record.

24       If there were requests for an evidentiary hearing, that

25   would need to come from a party, and I would need to see a

1    proffer.

2       So declarations can be sufficient.  So one question is why

3    can't declarations fully support the kind of record that would

4    be needed?

5       If evidence really would need to be presented, what exactly

6    would a witness testify to and how would it tie to the

7    preliminary injunction standards that the plaintiff is trying

8    to satisfy?

9           MR. SALAMA:  I have a question, Your Honor.

10          THE COURT:  Yes.

11          MR. SALAMA:  Your Honor said that the chances of it

12    happening again are speculative.  While they have --

13          THE COURT:  Of harm happening.

14          MR. SALAMA:  Of harm happening.

15       So if plaintiffs move forward with their intended attempt

16    to grow again, and the County comes in and does this again, I

17    mean, we have every indication that they will because they

18    have, so I'm not sure how that is speculative, Your Honor.

19       Forgive me.

20          THE COURT:  Well, you can get a copy of the

21    transcript --

22          MR. SALAMA:  Uh-huh.

23          THE COURT:  -- and read what I have said.

24          MR. SALAMA:  Yes.

25          THE COURT:  So I think if you address every single

1    question that I have raised --

2              MR. SALAMA:  Uh-huh.

3              THE COURT:  -- then you can refile a motion for

4    preliminary injunction.

5              MR. SALAMA:  Thank you, Your Honor.

6              THE COURT:  I understand you disagree with my

7    decision, but it's my decision.

8              MR. SALAMA:  Absolutely, Your Honor.

9              THE COURT:  All right.  So anything else today,

10   Mr. Salama?

11             MR. SALAMA:  No, thank you, Your Honor.

12             THE COURT:  Mr. Cole or Mr. Scholar?

13             MR. SCHOLAR:  No, Your Honor.

14             THE COURT:  All right.  I'll look for a motion for

15   preliminary injunction.

16        As always I will check to see if there is a specific date

17   by which I must make a decision.  If there needs to be an

18   expedited schedule, you can work with the opposing party and

19   see if you can develop an expedited briefing schedule.

20   Otherwise, the local rules and the federal rules would control,

21   and I'll hear the motion in the ordinary course of business.

22             MR. SALAMA:  Sounds great, Your Honor.  Thank you.

23             MR. SCHOLAR:  Thank you.

24             THE CLERK:  Court is in recess.

25        (Off the record at 4:06 p.m.)

1                         REPORTER'S CERTIFICATE

2                              ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5

6          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
7
           IN WITNESS WHEREOF, I subscribe this certificate at
8    Sacramento, California.

9

10      /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
11           Official United States District Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25